IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 4:12-CR-36 |
| v. | ORDER |
| ANGELA SHAE ELLISON, | |
| Defendant. | |

THE COURT HAS BEFORE IT defendant Angela Shae Ellison's motion to suppress statements, filed May 3, 2012.  The government resisted the motion on May 11, 2012.

After reviewing additional discovery, defendant filed supplemental motions to suppress on July 5, and 12, 2012, which the government resisted on July 11, and 13, 2012, respectively. The Court held an evidentiary hearing on July 13, 2012, and the combined motions are considered fully submitted.[1]

I.      BACKGROUND

The Court finds the following facts to be true based on testimony and evidence received during and prior to the hearing.  On May 20, 2010, Investigator Troy Wolff of the Iowa Medicaid Control Unit ("MFCU") went to the Cornerstone Counseling Center ("Cornerstone") in Centerville, Iowa to investigate allegations of billing fraud.  At all times relevant to this matter, Investigator Wolff was dressed in plain clothes, and did not carry a weapon.

Upon entering the business, Investigator Wolff encountered defendant Ellison, and asked

---

[1] With permission from the Court, the government filed a post-hearing brief on July 17, 2012.

to speak to the individual in charge.  Defendant told him that she was the owner, and agreed to speak with him.

As he began the interview,[2] Investigator Wolff told defendant the interview was completely voluntary, and that she was not required to participate.  After acknowledging that her presence and cooperation were voluntary, defendant informed Investigator Wolff that she wanted to speak with him.

During the course of the interview, defendant received a telephone call, at which point Inspector Wolff briefly stopped asking questions.  He stopped again when a customer came to defendant's front door.  After both interruptions, defendant confirmed that she remained willing to speak with him.  Defendant then proceeded to outline her personal situation, pointing out to Investigator Wolff that he was now in the role of therapist.

Investigator Wolff returned to Cornerstone on June 7, 2010 to obtain some documents. During the course of their brief conversation, defendant agreed to provide a written statement. To facilitate this statement, Investigator Wolff provided a standard MFCU form.  By later signing the document, defendant acknowledged that Investigator Wolff had identified himself to her "as a criminal investigator with the Iowa Department of Inspections and Appeals."  Gov't. Exh. 3.  Defendant also attested that she made the "statement voluntarily, of [her] own free will, and [that she understood that she] may discontinue this statement at any time."  *Id.*

Defendant and Investigator Wolff met a third time on June 16, 2010 at the Centerville Reservoir – a location chosen by defendant.  As with the first two interviews, defendant

---

[2] With defendant's express consent, Investigator Wolff recorded his May 20, and June 16, 2010 interviews of defendant.  These interviews, along with transcripts, have been made of record.  *See* Gov't Exhs. 1,1a, 2, 2a

confirmed that she understood her participation was voluntary, and she could choose to end the

interview at any time.   Investigator Wolff showed defendant some of the potentially

incriminating evidence he had gathered against her.  He later testified at the hearing that

defendant located the records herself, and helped him load the documents into his vehicle.

At some point thereafter, federal authorities assumed control of the investigation, and

obtained a search warrant for defendant's residence and business.  The warrant was executed on

July 8, 2010, by a team of state and local law enforcement assembled by Special Agent Kory

Ihnken of the United States Department of Health and Human Services, Office of Inspector

General.

The team arrived at defendant's residence between 7:00 and 7:30 a.m.  A uniformed

police officer, two or three sheriff's deputies, Special Agent Ihnken and another federal agent[3]

approached the residence before other team members, in order to perform a protective sweep

prior to initiating the search.  Defendant's husband, Bruce, saw the officers as they approached,

and went in the bedroom to wake up his wife.

Special Agent Ihnken testified that, once inside the residence, he told the Ellisons they

were free to leave.  He also indicated, however, that if they chose to stay in the residence they

would have to remain in a specified area at all times during the search.  The Ellisons chose to

remain on the premises during the search.

After the protective sweep was completed and the house secured, Special Agent Ihnken

called in the "second half" of his team, who initially had remained outside in a separate vehicle.

---

[3] This may have been Beth Thompson, a special agent with the Criminal Investigation
Unit of the  Internal Revenue Service.

Included among these officers were MFCU Investigators Daniel Hoffa, Jr. and Linda Ciprick.

Investigator Hoffa testified during the hearing that he and Investigator Ciprick were charged

with sitting with the Ellisons during the search, and conducting another interview if defendant

was willing to talk.[4]  Like Investigator Wolff and other MFCU investigators, Investigators Hoffa

and Ciprick were dressed in plain clothes and without weapons.[5]

Defendant again agreed to an interview, which Investigator Hoffa proceeded to record.

Both the recording and a transcript of the recording have been made of record.  *See* Gov't Exhs.

4, 4a.  According to the written transcript, Investigator Hoffa began the interview as follows:

> Q.    Okay.  And Angie, just like Troy [Wolff] has told you before, since we're
> with the Medicaid Fraud Unit, any interview that we conduct is considered
> voluntary.
>
> You know, obviously we do have some questions, and we really
> appreciate you being willing to talk to us, but you're not obligated to
> answer the questions, and any time you want to stop the interview, you
> just tell us and we'll stop right there, okay?
>
> A.    Okay.

Gov't Exh. 4a at 3-4.  Investigator Hoffa described both Ellisons as friendly, helpful and

talkative throughout their discussion.

After the search of the residence was completed, the agents informed the Ellisons that

---

[4] At some point during the search, defendant asked to change out of her pajamas.  Beth
Thompson, a special agent with the Criminal Investigation Unit of the Internal Revenue Service,
accompanied defendant to her bedroom to enable her to do so.  Special Agent Thompson
testified during the hearing that she also reinforced to defendant that she and her husband were
free to leave the residence at any time.

[5] Although not entirely clear from the record, it appears that the uniformed officer and
sheriff's deputies left the residence after the protective sweep, and remained outside during the
search.

4

they planned to search the business.  The Ellisons chose to follow the agents in a separate

vehicle.  Once the Ellisons arrived at the business, which was housed in an older, Victorian-style

home, Investigators Hoffa and Ciprick sat with them on the front porch.  Investigator Hoffa

reminded defendant that, "once again," "any conversation is voluntary," and that she was free to

stop the conversation at any time.  Govt's Exh. 5a at 2.  During the conversation, defendant

offered to get Investigator Hoffa a drink of water.  She later spoke with Special Agent Ihnken,

and offered to show him a storage unit outside Centerville that was not covered by the scope of

the warrant.

Defendant now moves to suppress all statements made during the May 20, June 7, and

June 16, 2010 interviews, as well as statements defendant made to authorities during the July 8,

2010 search of her residence and business.  Defendant claims the statements were involuntary

and elicited without benefit of *Miranda* warnings, in violation of her rights under the Fifth and

Fourteenth Amendments to the United States Constitution.  The government resists the motion,

arguing that the interviews were not custodial in nature, and therefore, did not fall within the

scope of *Miranda* and its progeny.


II.      APPLICABLE LAW AND DISCUSSION

A.      Governing Law

*Miranda* provides that when an individual is subject to custodial interrogation, law

enforcement must, prior to questioning, advise the individual of her right to be free from

compulsory self-incrimination and of the right to the assistance of counsel.  *U.S. v. Black Bear,*

422 F.3d 658, 661 (8th Cir. 2005).  Custodial interrogation, for purposes of *Miranda*, means

questioning initiated by law enforcement officers after a person has been taken into custody or

otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444.

   Whether an individual is "in custody" in this context turns on whether, under the totality

of the circumstances, the individual was free to leave the scene. *United States v. Boslau*, 632

F.3d 422, 427 (8th Cir. 2011) (citing *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009).

In *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990), the Eighth Circuit identified six

factors that are relevant to this inquiry:

> (1) whether the suspect was informed at the time of questioning that the
> questioning was voluntary, that the suspect was free to leave or request the
> officers to do so, or that the suspect was not considered under arrest; (2) whether
> the suspect possessed unrestrained freedom of movement during questioning; (3)
> whether the suspect initiated contact with authorities or voluntarily acquiesced to
> official requests to respond to questions; (4) whether strong arm tactics or
> deceptive stratagems were employed during questioning; (5) whether the
> atmosphere of the questioning was police dominated; or (6) whether the suspect
> was placed under arrest at the termination of the questioning.

*Id.* Significantly, "[a] statement made by a suspect that is voluntary and not in response to

interrogation is admissible with or without the giving of Miranda warnings." *United States v.*

*Head*, 407 F/3d 925, 929 (8th Cir. 2005). The fact that a suspect may not be aware of the

potential charges and/or penalties he or she may face is irrelevant to the issue of custody. *See,*

*e.g., United States v. Anaya*, 715 F. Supp. 2d 916, 929-31 (8th Cir. 2010).

   B.  Whether *Miranda* was Implicated Under Present Facts

   In the present case, application of the factors enumerated in *Griffin* confirms that

defendant was not "in custody" during any of the interviews at issue such that Investigators

Wolff, Hoffa or other law enforcement involved in the search were obligated to advise defendant

of her rights under *Miranda*. With regard to the first of these factors, the Court finds credible the

testimony of Investigators Wolff and Hoffa that each began his respective interview(s) by

informing defendant that she was not under arrest, was not obligated to participate in the

interview, and could terminate the discussion at any time.  The officers' testimony is further

confirmed in the hearing transcripts.

In *United States v. Czichray*, 378 F.3d 822, 926-27 (8th Cir. 2004) – a similar health care

fraud case – the Eighth Circuit considered evidence that law enforcement repeatedly informed

defendant of his right to discontinue the interview to be critical in deciding the discussion was

noncustodial in nature:

> That a person is told repeatedly that he is free to terminate an interview is
> powerful evidence that a reasonable person would have understood that he was
> free to terminate the interview.  So powerful, indeed, that no governing precedent
> of the Supreme Court or this court, or any case from another court of appeals that
> can be located (save one decision of the Ninth Circuit decided under an outmoded
> standard of review . . . holds that a person was in custody after being clearly
> advised of his freedom to leave or terminate questioning.

In the present case, four law enforcement officers – Investigators Wolff and Hoffa, and Special

Agents Ihnken and Thompson – testified that they repeatedly reminded defendant that her

presence and cooperation were voluntary.  As in *Czichray*, this Court finds such testimony to be

compelling evidence that defendant was not in custody during any of the interviews at issue.[6]

As to the second factor, the record is undisputed that defendant's freedom of movement

remained unrestrained throughout each of her interviews with Investigator Wolff.  During their

first meeting on May 20, 2010, Investigator Wolff stopped the interview twice in order to allow

defendant to answer the door and the telephone.  Although defendant admittedly was restricted

---

[6] As stated earlier, the testimony of Investigators Wolff and Hoffa are corroborated by the
written transcripts of their interviews.

to the living area and porch during the execution of the search warrant and her corresponding interviews with Investigator Hoffa, this fact alone does not dictate a finding that she was "in custody."  Rather, law enforcement repeatedly reminded defendant that she was free to leave the scene at any time, and limited defendant to these areas solely to ensure the search was not compromised.  *See, e.g., United States v. Axsom*, 289 F.3d 496, 502-03 (8th Cir. 2002) ("reasonable person" should have known the agents "restrained his freedom of action" "not to restrict his movement, but to protect themselves and the integrity of the search").

        With regard to the next factor, which party initiated the questioning, it is clear Investigators Wolff and Hoffa made the first contact.  From that point on, however, all evidence suggests defendant voluntarily participated in each interview.  Investigator Wolff testified that defendant not only confirmed in each interview that her answers were voluntary, but also offered unsolicited information on her personal circumstances.  In conjunction with the third interview at the Centerville Reservoir, defendant gave Investigator Wolff several boxes of documents she had collected herself that were relevant to the investigation.  She told Investigator Wolff not only that she was giving these documents voluntarily, but also that she had no problem identifying and collecting them.  Later, during the search of her business, defendant also *asked* to speak with Special Agent Ihnken, and *offered* to take him to a storage unit outside of town in which she apparently had maintained other relevant documents.  *See, e.g., United States v.Axsom*, 289 F.3d 496, 501 (8th Cir. 2002) (defendant "voluntary acquiesced" to requests to answer questions, made no apparent attempts to stop the questioning, and even offered to show agents two of his computers containing child pornography).

        The fourth factor, whether strong arm tactics or deceptive strategems were employed,

8

also goes against a custody situation.  Although uniformed officers admittedly made the first

contact with defendant at her residence, their purpose was solely to ensure the safety of the

Ellisons and officers at the scene.  At no time during any of the interviews did law enforcement

use physical force or threats of force against defendant or her husband.  In fact, the individuals

who conducted the primary interviews of defendant, Investigators Wolff and Hoffa, were

unarmed and in plain clothes.

With regard to the fifth factor, the Court finds that each of the interviews took place in a

non-threatening environment, with the first two taking place in defendant's business, the third

interview taking place in a location of defendant's choosing (the Centerville Reservoir), and the

latter occurring in defendant's residence and place of business.  During the search of defendant's

business, Investigator Hoffa spoke with defendant and her husband casually on the front porch.

Hearing testimony indicated that defendant remained relaxed and cooperative on each occasion,

and even offered Investigators Hoffa and Ciprick a beverage.  *See, e.g., Axsom*, 289 F.3d at 502

(the defendant was questioned while seated on an easy chair in his own home while smoking a

pipe).  Lastly, the sixth factor also goes against custody: The record shows defendant was not

placed under arrest until several months *after* the last of the interviews.  *See, e.g., United States*

*v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (lack of arrest held to be "'very important' factor

weighing against custody") (internal citation omitted).

Having found the totality of the circumstances–including all six *Griffin* factors--to weigh

against a custodial situation at any time relevant to this matter, the Court finds that a reasonable

person in defendant's position would not have perceived herself to be "restrained to a 'degree

associated with formal arrest.'" *Aksom*, 289 F.3d at 500 (citing *Griffin*, 922 F.2d at 1347).

9

C.      Whether Statements Were Voluntary

Although not developed in her pleadings, Ellison also asserts that several of her statements were involuntary. Whether a statement is involuntary turns on whether "'it was extracted by threats, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.'" *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)) (internal citation and quotation omitted). To make this determination, courts look at the "'totality of the circumstances,'" considering, among other factors, "'the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.'" *Id.* (quoting *Boslau*, 632 F.3d at 428). It is the government's burden to prove by a preponderance of the evidence that the statements at issue were voluntary. *Id.*

In the present case, the Court finds the government has met its burden with overwhelming evidence that defendant voluntarily cooperated with and provided statements to law enforcement. As discussed above, the record is devoid of evidence that law enforcement attempted to intimidate or coerce defendant into providing information. Rather, the investigators primarily responsible for eliciting statements began each discussion by informing plaintiff that her cooperation was voluntary and that she remained free to stop the conversation at any time. The fact defendant offered the investigators beverages and made small talk suggests the investigators established a relaxed, comfortable rapport with both defendant and her husband.

Although the precise length of each interview is not of record, this is not a situation where defendant was confined to a small room for hours without a break. *Cf. Jenner v. Smith*,

982 F.2d 329, 335 (8th Cir. 1993) (statements made by defendant found to be voluntary despite the fact she made the statements during the course of a seven-hour interview conducted in a small room at the police station, based on fact defendant traveled to police station voluntarily, was repeatedly told she was free to leave, and was not arrested at conclusion of interview).  In the present case, defendant was able to answer the phone, change her clothes, meet with a client, and speak with another officer upon request.

With regard to the next factor, the record shows that each interview was conducted in a location chosen by or comfortable to defendant, whether her house, place of business, or the Centerville Reservoir.  This fact goes against any suggestion that law enforcement was attempting to intimidate defendant in any way.  *See, e.g., Czichray*, 378 F.3d at 927 (in evaluating custodial nature of interview, fact interview took place on defendant's "own turf" detracted from finding that officers were intending to intimidate defendant).

The remaining factors evaluate the defendant's personal characteristics, such as her maturity, education level, and physical and mental condition.  *Vega*, 676 F.3d at 718.  Again, nothing in the record suggests defendant lacked the personal capacity to voluntarily consent to the interviews.  Defendant was a resourceful business owner with a nursing degree.  Her detailed responses to the interview questions, as well as her testimony during the hearing, suggests she was both mentally and physically capable of completing the interviews at issue.

Based on the totality of the circumstances, the Court finds defendant provided the challenged statements voluntarily.

III.     CONCLUSION

For the foregoing reasons, defendant's original and supplemental motions to suppress are denied.

IT IS ORDERED.

Dated this 26th day of July, 2012.


_____
RONALD E. LONGSTAFF, Senior Judge
United States District Court